IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | No. 23 CR 21 |
| v. | ) | |
| | ) | Judge John J. Tharp Jr. |
| ANTHONY REED | ) | |

## SENTENCING MEMORANDUM

Anthony Reed respectfully requests that the Court impose a sentence of 121 months of incarceration. Mr. Reed was twenty-five years old when he committed the offense. Sentencing him to more than a decade in custody would be a harsh punishment that would appropriately account for the seriousness of his conduct. A sentence of 121 months would also represent a punishment at the high end of the guidelines range that applies to Mr. Reed's conduct (as opposed to the range that applies based on the government's charging decisions).

Most importantly, a 121 month sentence would appropriately balance the § 3553(a) factors in this case. Mr. Reed has suffered from an undiagnosed intellectual disability throughout his life. Recent cognitive testing shows that Mr. Reed has an IQ of 67; that he is in the bottom 1–2% of cognitive ability; and that he reads and writes at an elementary school level. Exh. A, Neurocognitive Evaluation, at 3. Moreover, Mr. Reed grew up in a desperately poor, single parent household. PSR at ¶ 88. He was exposed to violence and drugs at a young age. *Id.* None of that excuses Mr. Reed's offense. But Mr. Reed's intellectual disability and difficult upbringing provides important context for understanding why this offense occurred and for determining

1

what the appropriate punishment should be. Taken as a whole, the § 3553(a) factors support a sentence of 121 months of incarceration.

## BACKGROUND

Anthony Reed and his seven siblings were raised by his mother. PSR at ¶ 88. His parents separated when he was young and his father was not involved in raising him. *Id.* As the PSR notes, "the family struggled financially, and lacked the basic life necessities, such as food and stable housing." *Id.* Mr. Reed's mother was frequently behind on rent, and the family often needed to stay with relatives or in homeless shelters. *Id.*

While the family moved around throughout Mr. Reed's childhood, the neighborhoods where they lived were invariably "high in crime, violence, gang activity, and drug activity." *Id.* From a very young age, Mr. Reed was exposed to that violence. He regularly heard gun shots on the streets growing up. When he was 11, he saw a friend—who was about his same age—get shot and killed in front of him. *See* PSR at ¶ 97. When he was a little older (around 16), he witnessed a drive-by shooting in the park.

Besides violence, Mr. Reed was also exposed to drugs and alcohol when he was still a child. When Mr. Reed was 11, an uncle (who was, in fairness, not much older than Mr. Reed) invited him to start drinking alcohol with him. *Id.* at ¶ 104. Mr. Reed was introduced to marijuana even younger—when he was just 9 years old. *Id.* at ¶ 105.

By the time Mr. Reed was sent to elementary school, there were concerns about

his cognitive development and behavior. On three occasions—when he was 10, 11, and then 12 years old—Mr. Reed was admitted for inpatient psychiatric evaluations at Hartgrove hospital. *Id.* at ¶ 97. During these admissions, Mr. Reed was diagnosed with ADHD and "impulse control disorder." At school, Mr. Reed received an IEP and was placed in special education classes. *Id.* at ¶ 111.

Despite these interventions, Mr. Reed never received consistent or effective mental health treatment. While Hartgrove prescribed psychiatric medication, his family let the prescriptions lapse once he was discharged from the hospital. Moreover—possibly because Mr. Reed was so young at the time of those admissions—neither Hargrove nor anyone else ever performed the kind of thorough cognitive evaluation that would have revealed the extent of Mr. Reed's intellectual disability.

That backdrop, of severe material deprivation and untreated intellectual disability, provides context for Mr. Reed's teenage years. He did not do well in school. His grades were terrible. Exh. C, CPS Transcript. And Mr. Reed sustained a number of juvenile arrests, largely for drug-related cases. *See* PSR at ¶ 64.

Despite those significant issues, Mr. Reed managed to graduate from an alternative high school. *See* PSR at ¶ 111. In addition, Mr. Reed proved himself to be a hard worker throughout his childhood. Even as a young kid, Mr. Reed would take odd jobs to get money for food and to get supplies for his family. *See* PSR at ¶ 88. In high school, he took a summer job putting up signs and flyers for his local alderman. And, after graduating high school, Mr. Reed worked a series of retail and factory jobs—as a cook at Burger King, at a factory making packaged snacks, and at a phone

repair store. *See* PSR at ¶¶ 116–118. Now, admittedly, Mr. Reed did not stay at any of these jobs for very long. And he often left for reasons, like lack of transportation, that arguably could have been overcome with more diligence. Even still, it is probably fair to say that, at the time of his arrest, Mr. Reed had established a more significant work history than many of the 25 year old defendants who come before this Court.

Besides work history, one theme that comes through in the character letters is Mr. Reed's consistent support for his family. Of the eight children in the house, Mr. Reed was the oldest boy. PSR at ¶ 87. As a result, he took on almost parental responsibilities for his younger siblings. *See, e.g.*, Exh. D, Letter from Shacyra Reed (sister) (noting that Reed "fill[ed] that void of an absent father of our siblings"); Exh. E, Letter from Taniya Johnson (sister) (noting that "he took on a leadership role in our household due to my mother being a single woman"). In addition, when Mr. Reed's mother was diagnosed with colon cancer in 2021, Mr. Reed became her primary caregiver.

Of course, those positive qualities do not excuse Mr. Reed's serious offense conduct. They are relevant because they paint a picture—consistent with the medical literature about intellectual disability—of someone who is unusually susceptible to external influence. During the times in his life when Mr. Reed has been living in a supportive, calm environment (such as when was living his sister Sharron Chestnut in Manteno and Joliet), he has been able to work and lead a relatively normal life. During times when he has been in an unstructured, stressful environment (such as in 2021 and 2022, when he was living in Englewood and taking care of his dying

4

mother), his decision making was far worse.

## DISCUSSION

The Presentence Report has calculated that Mr. Reed faces an advisory guidelines range of 181–205 months (consisting of 84 months on the 924(c) count and 97–121 months on the other counts of conviction). *See* PSR at ¶¶ 123–124. The defense has one objection to this calculation. Based on the interview that police conducted with the cab driver immediately following the February 4 robbery, the defense believes that the two-level enhancement for "bodily injury" should not be applied. *See* PSR at ¶ 20. This would result in a guidelines range of 78–97 months (in addition to the recommended seven-year sentence for the 924(c) conviction).

After discussing this guidelines objection, the defense will turn to the Section 3553(a) factors. In its sentencing recommendation, Probation suggested that these factors weigh in favor of a below-guidelines sentence in this case. The defense agrees with that. Ultimately, the defense would ask the Court to go slightly further than Probation's recommendation and impose a 121-month sentence. This memorandum will offer two alternative (though complementary) paths for concluding that the § 3553(a) factors support a 121 month sentence.

*First*, the Court should exercise its discretion, under *Kimbrough*, to start its § 3553(a) analysis from the guidelines range that applies to Mr. Reed's conduct—not from the range that has resulted from the government's charging decisions. Under §2B3.1, the guidelines for the three armed robberies at issue here (including the weapons enhancements for all counts, as well as the other enhancements suggested

5

by Probation) would be 97–121 months.

While §2K2.4 recommends an additional 84 months of incarceration based on Mr. Reed's § 924(c) conviction, the Court should decline to consider a guidelines enhancement that is based on the government's charging decisions. The Sentencing Commission has repeatedly criticized this charge-based kind of enhancement as bad sentencing policy. *See, e.g.*, United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 60–61 (2011);[1] United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 31 (1991).[2] And the Supreme Court has suggested that this guidelines enhancement is in serious tension—or even outright inconsistent—with the commands of Section 3553(a). *See Dean v. United States*, 581 U.S. 62, 68 (2017) (holding that sentencing court "could not reasonably ignore the deterrent effect" of § 924(c) sentence when deciding appropriate punishment for predicate counts).

*Second*, even aside from any policy questions about the appropriateness of §2K2.4, the Court should conclude that Mr. Reed's individual circumstances support the imposition of a 121-month sentence. As discussed above, Mr. Reed has suffered from an undiagnosed intellectual disability for his entire life. As the Supreme Court has explained, intellectual disability is a mitigating factor that should affect the way

---

[1]    Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/mandatory-minimum-penalties/20111031-rtc-pdf/Chapter_03.pdf.

[2]    Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/mandatory-minimum-penalties/1991_Mand_Min_Report.pdf.

the Court assesses Mr. Reed's culpability, the need for deterrence, and the prospect of rehabilitation. *See, e.g.*, *Hall v. Florida*, 572 U.S. 701, 708 (2014); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). The defense will argue that Mr. Reed's intellectual disability becomes more relevant still when it is placed in the broader context of his life—including his difficult childhood, his work history, and his conduct following his arrest.

After discussing § 3553(a), the defense will briefly discuss the proposed conditions of supervised release. The defense objects to two of the proposed conditions. First, the defense would ask that discretionary condition 14 be expanded, to allow Mr. Reed to travel to the Central District of Illinois, given his significant family ties to the Manteno area. Second, the defense would ask the Court not to impose special condition 13 (requiring Mr. Reed to provide notice of certain "risks" as determined by Probation), based on constitutional considerations that will be explained in greater detail below.

## I. The defense objects to the application of the bodily injury enhancement.

In calculating Mr. Reed's guidelines range, the PSR applies a two-level enhancement to the February 4 robbery "because Victim A sustained bodily injury." PSR at ¶ 20. For the reasons laid out below, the defense does not believe that the enhancement properly applies. But, as an initial matter, the defense would emphasize the limited nature of this objection. The defense is not disputing that Mr. Reed struck the cab driver with the gun. *See* Dkt. 102, Plea Agreement, at 3 (acknowledging this conduct). Indeed, the video of this incident is already in the

7

record at Dkt. 63-2. In addition, the defense also wants to be clear that—in objecting to this enhancement—it is not trying to justify or excuse the underlying conduct.

Having said that, the guidelines set out a specific standard for when this enhancement should apply. In particular, the guidelines instruct courts to apply this enhancement only when the victim sustains "a[] significant injury; *e.g.,* an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. §1B1.1, comment n.1(B). The injury suffered by Victim A does not meet those criteria.

The best evidence on the question whether Victim A sustained a "significant injury" is the body worn camera footage depicting an interview that Chicago police officers conducted about half an hour after the robbery occurred. *See* Exh. G, Video of Driver Interview. During this interview, the cab driver informs the police that he was struck with a gun. *Id*. On two separate occasions, the police ask the driver if he would like medical assistance. Both times, the driver says no. *Id*. at 2:24–2:30[3] (Q: "You need an ambulance? A: No, no, I'm okay. I'm okay"); at 10:14–10:18 (Q: "You said you don't need any medical attention?" A. "No, no, I'm okay"). The driver's demeanor also does not reflect a significant injury. The driver is, of course, upset and angry about what just happened. But he does not appear to be in pain. He is not wincing, or clutching his head, or showing other signs of being affected by the injury.

Finally, the defense would note that—near the end of the interview—the driver

---

[3] This time range refers to the minutes and seconds on the video player itself, as opposed to the time stamp in the top right corner of the video.

shows the police the area where he was struck in the head. *Id.* at 10:20–10:30. The body worn camera captures a clear image of his forehead, and there is no cut, bruising, or other visible evidence of injury. *Id.*

The government's primary evidence as to the significance of the injury comes from an FBI 302 that was prepared in June 2024, roughly two and a half years after the robbery occurred. *See* Exh. H, FBI Report. In a conversation with the FBI, the cab driver stated that he "developed a bump on his head that lasted several weeks" and that "the hair at the injury site would not grow back" for a period of time. *Id.* The reference to hair loss is somewhat confusing, because—in the video—the driver shows the police that he was struck on the forehead, below his hairline. The bump is not evident from the video either. This is not a reason to doubt the driver's statement: the bump easily could have been too small to be seen clearly on camera. But given the contemporaneous video evidence—which shows no visible injury, and that the driver declined multiple offers of medical assistance—the defense would respectfully suggest that this bump was not "significant" in the sense that is required to trigger the application of §2B3.1(b)(3)(A).

## II. The Section 3553(a) factors support the imposition of a 121 month sentence.

Regardless of how the Court decides the guidelines objection laid out above, the Court should conclude that a sentence of 121 months is "sufficient, but not greater than necessary" to achieve the ends of sentencing set out in Section 3553(a). The Seventh Circuit has held that, "[w]hile the § 3553(a) analysis still begins with a consideration of the guidelines, it does not end there. The sentencing judge may not

perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case." *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015) (internal citation omitted). Instead, sentencing courts must "'consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). That individualized analysis justifies a 121 month sentencing in this case.

    A.    *The Court should exercise its policy discretion to discount Section 2K2.4, sentence Mr. Reed based on his conduct rather than the government's charging decisions.*

Mr. Reed recognizes that, because he pled guilty to one count of brandishing a gun in violation of § 924(c), the Court is required to impose a prison sentence of at least seven years. 18 U.S.C. § 924(c)(3)(A)(ii). And Mr. Reed also understands that this seven year sentence must be "in addition" to the punishment that the Court imposes on the predicate counts of conviction. *Id.*

But the sentencing procedure envisioned in Guidelines §2K2.4 is significantly more punitive than what the text of Section 924(c) requires. In particular, §2K2.4 advises the Court to calculate the sentence for the predicate counts *independently* from the Section 924(c) sentence and then add those two independent sentences together. That artificial, convoluted procedure is at odds with § 3553(a)'s command to impose a single sentence that is "sufficient, but not greater than necessary" to achieve the ends of sentencing. 18 U.S.C. § 3553(a).

This Court is "at liberty to reject *any* Guideline on policy grounds," so long as the basis for the policy disagreement is reasonable. *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (emphasis in original). Policy based disagreements with the guidelines are especially appropriate in situations when it comes to "Guidelines [that] do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). That is the case here.

For more than 30 years, the Sentencing Commission has criticized sentencing enhancements that are based on the government's charging decisions as bad sentencing policy. For instance, in a 2011 report to Congress, the Commission contrasted § 924(c) penalties to the more appropriate firearm penalties included in other sections of the guidelines, explaining that:

> [u]nlike section 924(c), the length of the [firearms] enhancement under the guidelines increases or decreases in proportion to the severity of the underlying offense (as represented by the total offense level) and the offender's criminal history. . . . In sum, mandatory minimum penalties structurally are unable to draw the fine distinctions among offenders and offenses that can be made under the guideline system.

United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 60–61 (2011). This 2011 report repeated criticisms that the Commission had made as early as 1991. *See* United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System 31 (1991) (noting that "[u]nfortunately, the sentencing guidelines are unable to overcome" the cliff effects created by mandatory minimums, such as § 924(c) "and thereby successfully fulfill the Sentencing Reform Act's goal of ensuring comparable sentences for similarly-situated defendants").

Instead of representing the Sentencing Commission's considered policy judgment, the structure of §2K2.4— which advises to calculate the appropriate sentence predicate sentences *independently* of the § 924(c) sentence—was based on a misunderstanding of what the law requires. *See* 2011 Report at 55 (noting that Section 2K2.4 was drafted "[t]o ensure the guidelines' consistency with federal law"). For years, Seventh Circuit precedent incorporated a similar misunderstanding. *See, e.g.*, *United States v. Roberson*, 474 F.3d 432, 436 (7th Cir. 2007) (holding that, based on the language of § 924(c), "[t]he district judge was therefore required to determine the proper sentence for the bank robbery entirely independently of the section 924(c)(1) add-on").

But in 2017, the Supreme Court corrected this mistake. *Dean v. United States*, 581 U.S. 62, 68 (2017). In *Dean*, the Court held that "[n]othing in § 924(c) restricts the authority conferred on sentencing courts . . . to consider a sentence under § 924(c) when calculating a just sentence for the predicate count." *Id.* Going further still, several statements in *Dean* suggest that sentencing courts *must* consider the effect of the § 924(c) sentence in order to reasonably assess how the § 3553(a) factors bear on the appropriate sentence for the predicate offense.

For instance, in discussing § 3553(a)(2)(C)'s "directive that a court assess 'the need for the sentence imposed . . . to protect the public from further crimes[,]'" the Supreme Court noted that the length of the § 924(c) sentence "*surely bears* on whether—in connection with his predicate crimes—still more incarceration is necessary to protect the public." *Id.* (quoting 18 U.S.C. § 3553(a)(2)(C) (emphasis

12

added)). Similarly, the Supreme Court held that observed that "in considering 'the need for the sentence imposed . . . to afford adequate deterrence,' § 3553(a)(2)(B), the District Court *could not reasonably ignore* the deterrent effect of Dean's 30-year mandatory minimum." *Id.* (emphasis added). Because §2K2.4 advises the Court to ignore the § 924(c) sentence when calculating the appropriate range on the predicate counts, its advice is inconsistent with § 3553(a).

Ultimately, Mr. Reed's offense conduct—not the government's charging decisions—is what should determine his punishment. Based on Mr. Reed's conduct (including the use of a firearm in each robbery), the robbery guidelines recommend a sentence of 97–121 months.[4] Because the Sentencing Commission has made it clear that the alternate sentencing calculations set out in §2K2.4 are not wise sentencing policy—and because *Dean* establishes that nothing in §2K2.4 is required by law—the Court should use the range set by Mr. Reed's conduct as "the starting point and the initial benchmark" for its § 3553(a) analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007).

B.   *Individualized consideration of Mr. Reed's history and characteristics also supports the imposition of a 121 month sentence.*

For the reasons discussed above, the defense believes that a guidelines range of 97–121 months is the appropriate starting point in this case. But, regardless of where the Court starts, the individualized consideration of Mr. Reed's history and

---

[4]   It is worth observing that this range is significantly (and appropriately) higher than the range that Mr. Reed would have faced if his offense had not involved the use of a weapon. In the absence of a weapon, Mr. Reed would have faced a guidelines range of around 51–63 months of incarceration.

circumstances demonstrates that a sentence of 121 months is a sufficient punishment.

      1.    <u>Mr. Reed's previously undiagnosed intellectual disability weighs in favor of a 121-month sentence.</u>

Recent cognitive testing shows that Mr. Reed has an IQ of 67. Exh. A at 3. His reading, spelling, and math calculation abilities are at the third or fourth grade level. *Id.*; *see also*, Cleveland Clinic, *Intellectual Disability*, https://my.clevelandclinic.org/ health/diseases/25015-intellectual-disability-id (noting that mild intellectual disability corresponds to "an average mental age of between 9 and 12"). The cognitive testing also showed [i]ndication[s] of impulsivity and disinhibition" and noted that his "[e]xecutive cognitive abilities . . . are poor and consistently below the 2nd percentile." *Id.* at 4.

The Supreme Court has spoken directly to the question of how intellectual disability should bear on the sentencing analysis. *See, e.g.*, *Hall v. Florida*, 572 U.S. 701, 708 (2014); *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). As the Court explained in *Hall*, "[t]he diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of punishment." *Hall*, 572 U.S. at 709; *see also Atkins* 536 U.S. at 306 ("Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct"). Intellectual disability affects the assessment of deterrence as well. The intellectually disabled have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses," which makes the rational

14

cost/benefit assumptions that underlie deterrence theory less applicable in this context. *Atkins*, 536 U.S. at 320.

Of course, *Hall* and *Atkins* are capital cases. The defense recognizes that the Supreme Court has not prescribed any special rules that apply to the consideration of intellectual disability in the non-capital context. But the logic underlying *Hall* and *Atkins*—that intellectual disability diminishes personal culpability and lessens the need for punishment—extends here as well. While Mr. Reed's intellectual disability certainly does not "warrant an exemption from criminal sanctions," it does suggest that a 121 month sentence would be sufficient to punish his offense. *Atkins*, 536 U.S. at 318.

      2.    <u>When Mr. Reed's intellectual disability is considered in the context of his upbringing and environment, it provides reason to believe that he can be successful with appropriate structure and support.</u>

While intellectual disability appropriately bears on the Court's assessment of the § 3553(a) factors, nothing in this argument should be taken to suggest that the intellectually disabled—or Mr. Reed specifically—are especially inclined towards criminal behavior. The Supreme Court has rejected that notion. *Atkins*, 536 U.S. at 318 ("There is no evidence that they are more likely to engage in criminal conduct than others[.]"). And it finds no support in the academic literature either. *See* Karen Salekin, et al., *Offenders with Intellectual Disability: Characteristics, Prevalence, and Issues in Forensic Assessment*, 3 J. Mental Health Res. Intellectual Disabilities 97, 110 (2010) ("[r]search has not borne out the notion that offenders with ID have a propensity to act out violently or to engage in any one particular criminal endeavor").

Instead, what the research shows is that people with intellectual disabilities are unusually susceptible to external influences. People with intellectual disabilities "learn via imitation of others and to rely more on cues from others than do typically developing individuals." *Id.* at 99. Given their impulsivity, limited ability to reason independently, or exercise good judgment, "their behavior is greatly influenced by" their environment and by the behavior "of their immediate and extended family members." *Id.* Their capacity for independent judgment and good decision-making is especially compromised "during periods of personal or economic stress. *Id.* at 100.

That research has obvious application to Mr. Reed's case. The conditions of Mr. Reed's childhood—growing up in poverty, in violent neighborhoods, without a father—goes a long way towards explaining his criminal history throughout his teens and early 20s. And Mr. Reed's circumstances in 2021 and 2022, when he was dealing with the stresses of caring for his dying mother, provides some context for understanding the present offense. As Mr. Reed put it in his letter, "When my mom got sick, it through [sic] my focus off. I start[ed] going to the street more. I start[ed] useing drugs." Exh. B, Anthony Reed's Letter to the Court.

Moreover, the converse point holds true as well: During the times in Mr. Reed's life when he has had (relatively) more structure and support, there have been corresponding improvements in his conduct. When he was in his early 20s, Mr. Reed moved out of Chicago to live with his oldest sister, Sharron. During that time, Mr. Reed was working. *See* PSR at ¶¶ 115–118. And his conduct with the criminal justice system was less frequent and less serious during this period as well.

16

The fact that Mr. Reed responds strongly to outside influences provides some reason to believe that—with appropriate support—he can be successful on supervised release. *See* Salekin, *Offenders with Intellectual Disability*, at 100 ("With appropriate supports, individuals with mild mental retardation can usually live successfully in the community" (quoting Diagnostic and Statistical Manual of Mental Disorders 43 (4th. ed. 2000))); *see also* Exh. A at 5 (noting the importance of "providing supervision and oversight, and mentoring" for people with intellectual disabilities).

On supervised release, appropriate support can be put in place to help Mr. Reed cope with his cognitive limitations. For one thing, Mr. Reed will have access to mental health interventions like cognitive behavioral therapy and anger management, which have been shown to be effective at addressing impulsivity and poor judgment issues in people with intellectual disabilities. *See* Jessica Jones, *Persons with Intellectual Disabilities in the Criminal Justice System*, 51 Int'l. J. Offender Therapy and Comp. Crim. 723, 729 (2007). In addition, Mr. Reed will be older when he is released from custody. He was 25 when he committed this offense. As the Sentencing Commission has noted, "[t]he age-crime curve," which is "one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age." U.S.S.G. §5H1. Maturity will help mitigate some of the impulsivity and judgment issues that led to this offense. And, finally, Mr. Reed will likely be able to move back out of Chicago to live with his sister Sharron. *See* Dkt. 46, 7/31/23 Pretrial Report (noting Sharron's willingness to allow Mr. Reed to live with her in Manteno); Dkt. 99, 1/7/25 Pretrial Report (same). As the defense has noted

above, living outside of Chicago—and having Sharron's support—has generally been a good thing for Mr. Reed in the past.

### 3.  Mr. Reed's conduct in custody also supports the imposition of a 121 month sentence.

Finally, the defense will make a few points about how Mr. Reed's post-arrest conduct should affect the Court's sentencing decision.

***First*** is a technical—but not insignificant—argument regarding prior custody credit. During the pendency of this case, Mr. Reed went to trial in the Circuit Court of Kankakee County in a domestic violence case. PSR at ¶ 59. At trial, Mr. Reed was acquitted of the felony charge, but was convicted of a class A misdemeanor. *Id.* He was sentenced to 364 days, time considered served. Under Illinois law, Mr. Reed was required to serve 50% of that sentence. *See* 730 ILCS 5/3-6-3(a)(2.1). Because Mr. Reed was in state pretrial custody on that case from August 7, 2020 to February 27, 2021—a period of more than 6 months—Mr. Reed effectively completed that sentence before his April 19, 2022 arrest in the present case.

But the Bureau of Prisons does not account for state sentencing credit when it performs federal sentencing calculations. *See Kayfez v. Gasele*, 993 F.2d 1288, 1290 (7th Cir. 1993) (noting that, for purposes of computing a state sentence, the Bureau of Prisons gives "exclusive consideration of the full term as a matter of administrative convenience"); *see also* Bureau of Prisons, Program Statement 5880.28: Sentence Computation Manual at 1–15A ("A sentence imposed by a court for 'Time Served' means all time spent in official detention . . . is included in the 'Time Served' sentence which the court imposed and cannot be awarded to any other sentence").

18

While the BOP's practice may make sense as a matter of administrative convenience, it means that Mr. Reed will face a period of about 5 months of dead time—time he spent in jail that was unnecessary for the completion of the state sentence, but that will not count towards the federal sentence. While that is hardly the biggest issue in this case, it is unjust. Time that a person spends in custody should count towards something. As a result, the defense would ask the Court to reduce Mr. Reed's sentence by 5 months to account for this time that will otherwise be uncredited by the Bureau of Prisons. In the alternative, the defense would ask the Court to run Mr. Reed's robbery sentence concurrent to the sentence imposed in 2020cf267. By operation of the Bureau of Prison's *Willis* doctrine, running the sentences concurrent would prompt the BOP to credit Mr. Reed for the time he spent in pretrial confinement starting from April 19, 2022. *See* BOP, Sentence Computation Manual at Bureau of Prisons, Program Statement 5880.28: Sentence Computation Manual at 1–22 to 1–22B (describing *Willis* credit rules); *see also Willis v. United States*, 449 F.2d 923 (5th Cir. 1971).

**Second**, the defense would ask the Court to consider Mr. Reed's conditions of confinement at Kankakee Jail. *See United States v. Szanto*, 05-CR-879, 2007 WL 3374399, at 3 (N.D. Ill. Nov. 8, 2007) (explaining that "the state facility in Kankakee . . . by all accounts, is far and away the most substandard facility in the area in which the Bureau of Prisons contracts to house its population."). Defense counsel recognizes that complaints about conditions at Kankakee often give the impression of being boilerplate arguments. But this issue is particularly significant to Mr. Reed. He has

filed a civil complaint (with the assistance of a jailhouse lawyer), which describes how the conditions at Kankakee have affected him. *See Reed v. Downey*, 2:24cv2230 (C.D. Ill. July 2, 2024) (Dkt. 1). In that complaint, Mr. Reed describes the lack of access to the outdoors or even to natural light; the inability to have in person visits with his family members; as well as a number of health and sanitation issues. *Id.* Those are factors that the Court should take into account when fashioning an appropriate sentence.

*Finally*, the Court should consider Mr. Reed's efforts at rehabilitation over the last several years. While Kankakee does not offer any in-person programming, it is possible to take online coursework. Mr. Reed has tried to take full advantage of what is on offer. He has completed classes on cognitive behavioral therapy, anger management, as well as job training courses. Exh. I, Kankakee Transcript. This provides further evidence that Mr. Reed is trying to address the issues that led to this offense and that he wants to lead a law-abiding life upon his release.

## III. Objections to the proposed conditions of supervised release.

The defense has two objections to the conditions of release proposed in the PSR. *First*, the defense would ask the Court to modify Discretionary Condition 14. As it is currently written, that condition requires Mr. Reed to remain within the "federal judicial district where you are being supervised," which—unless the probation department of another district accepts courtesy supervision—will likely be the Northern District of Illinois. But Mr. Reed has significant family ties to Manteno, Illinois, which is roughly 5 miles outside of the Northern District. Mr. Reed's sister lives there, and his sone lives nearby in Kankakee. As a result, the defense would

20

respectfully request that Discretionary Condition 14 be modified to allow travel within the Northern and Central Districts of Illinois.

*Second*, the defense objects to Special Condition 13. This condition provides that:

> If the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

PSR at 27. The Seventh Circuit has repeatedly held that this kind of risk notification condition is impermissibly vague. *See, e.g.*, *United States v. Guidry*, 817 F.3d 997, 1010 (7th Cir. 2016) (holding that risk notification condition suffers from "numerous ambiguities"); *United States v. Kappes*, 782 F.3d 828, 849 (7th Cir. 2015) (same); *United States v. Thompson*, 777 F.3d 368, 379 (7th Cir. 2015) (holding that risk notification condition was "riddled with ambiguities" because "[t]here is no indication of what is meant by 'personal history' and 'characteristics' or what 'risks' must be disclosed to which 'third parties'). In addition, the Seventh Circuit has recognized that these kinds of notification conditions "implicate[] government-compelled speech in violation of the First Amendment." *United States v. Russell*, No. 24-1652, 2025 WL 1646825, at *6 (7th Cir. June 11, 2025).

Besides—or perhaps because of—these constitutional issues, this condition would pose practical problems as well. Depending on the circumstances, requiring Mr. Reed to provide notice that Probation has deemed him a "risk" could easily

jeopardize his employment, his housing, his educational opportunities, or other support services. If the need for some specific notification arises during the period of Mr. Reed's supervision, Probation can file a special report with the Court. But, for now, the Court should decline to impose this vague, overbroad, and potentially counterproductive condition.

## CONCLUSION

The Court should sentence Mr. Reed to 121 months of incarceration. That sentence would fall within the range that the Sentencing Commission has deemed appropriate for Mr. Reed's conduct. And it would appropriately account for the significant mitigating factors—including undiagnosed intellectual disability and a difficult, poverty-stricken childhood—that are present in this case.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By:    /s/ William Hardwicke
William Hardwicke
Attorney for Anthony Reed

WILLIAM HARDWICKE
FEDERAL DEFENDER PROGRAM
55 E. Monroe, Room 2800
Chicago, IL 60603
312 621-8302